IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHARMAINE MCGUFFEY, | : | Case No. 1:18-cv-322 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER DENYING DEFENDANTS'** |
| | : | **MOTION TO DISMISS AND FOR** |
| HAMILTON COUNTY SHERIFF'S | : | **SUMMARY JUDGMENT** |
| OFFICE, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

This matter is before the Court on Defendants' Motion to Dismiss and for Summary Judgment (Doc. 78). Plaintiff opposed the motion, and Defendants replied in support of the motion. (Docs. 90, 102.) The Court heard oral argument on July 22, 2020. For the reasons set forth below, Defendants' motion will be **DENIED**.

## I. BACKGROUND

### A. The Neil Administration

Plaintiff Charmaine McGuffey, an openly lesbian female, began her career with the Hamilton County Sheriff's Office ("HCSO") in 1983. During various times, McGuffey served as a Corrections Officer, Trainer, Electronic Monitoring Deputy, and Training Captain.

When Jim Neil was elected Sheriff in fall 2012, McGuffey—whom he had known since he was 18 years old—served as part of a transition team that assisted Neil in planning the HCSO department and personnel structure. As part of a restructuring plan "to do more with less," they decided to consolidate the Jail and the Court Divisions. (Neil Dep., Doc. 19 at PageID 152–153.) Neil promoted McGuffey to Major of Jail and Court Services in 2013. McGuffey was the first woman to hold the rank of major in the HCSO. She remains the only woman to have held

1

the major rank.  This newly created position combined duties previously performed by three

male Majors.

Neil appointed Mark Schoonover to be his Chief Deputy, a position that reported directly

to him.  Schoonover supervised the Internal Affairs Division ("IA"), and all Majors (including

McGuffey) reported directly to Schoonover.

Major McGuffey requested—and Sheriff Neil approved—rehiring Heather Dobbins, a

former HCSO employee, to serve as her administrative assistant.  At the time of her promotion,

the Jail was deficient in several areas, "so it was a task of Major [McGuffey] to work to get us

back in, to do her due diligence to get us back in compliance . . . which she was able to do with

the jail standards set by the state."  (Doc. 19 at PageID 148.)  According to Neil:

> Over the course of the four years that she was the Major she received
> a number of letters of appreciation and accolades from both partners
> in the private sector, as well as partners in the public sector.  She
> had a reputation at the state level with the . . . State Sheriff's
> Association for her work in corrections.  Over the body of her career,
> not just as a major, but she has a reputation with other sheriff's
> offices and sheriff's offices' deputies who worked with her on a state
> basis when it comes to jail standards in Ohio.  She's worked with
> other sheriff's deputies from other offices as well.  She has a
> reputation that goes back to her days in Training as well.

(Doc. 19 at PageID 149; *see also* Exh. L, Doc. 19-19 at PageID 799–815.)  Defendants admit

that McGuffey, through "passion" and "experience" also created innovative jail programming

that never had been done before in Hamilton County and helped take the Jail "to another level."

(Doc. 19 at PageID 165.)  In McGuffey's only performance review as a Major, Neil assigned her

an "A," adding that she was his favorite major.  (*Id.* at PageID 221–222.)

This, however, is where the parties' positions diverge.  According to McGuffey, female

officers within the HCSO, historically, "were not respected, were not promoted appropriately,

and were really kind of treated like second-class citizens."  (McGuffey Dep., Doc. 74 at PageID

2

8897.)  When McGuffey became Major of Jail and Court Services, she spoke with Sheriff Neil

and Chief Deputy Schoonover about two subordinates she believed to be disrespectful or

insubordinate to her, and the Sheriff dismissed her concerns, saying, "these guys just don't like

working for a woman" and "you've got to get along with these guys."  (Doc. 74 at PageID 9013,

9063.)

### B.  Excessive Use-of-Force Concerns

Early in the Neil administration, Sergeant William Rarrick transferred to IA.  After

"about six hours of on-the-job training," he became the sole officer assigned to conduct IA

investigations.  (Rarrick Dep., Vol. 1, Doc. 46 at PageID 4928.)[1]  A month or two later, Steve

Minnich transferred to IA to assist Rarrick in Internal Affairs.  According to McGuffey, Rarrick

"approached me and told me that he should be the person running the jail, and not me [and] . . .

he had the credentials to run that jail better than I could run it."  (Doc. 74 at PageID 8973–8974.)

Rarrick, as head of IA, reported directly to Schoonover.  After he assumed the IA role,

Rarrick began complaining about McGuffey.  (Doc. 46 at PageID 4931.)  Specifically, he and

McGuffey had a dispute about proper use of force.  According to Rarrick, the national standards,

applied both to patrol officers and in a jail setting.  The Sheriff could set additional standards for

a "controlled setting" like a jail if he wanted, but Sheriff Neil had not done so.  (*Id.* at PageID

4933–4937.)  Rarrick complained that McGuffey wrote officers up for use-of-force incidents

that, to Rarrick, were not excessive under the approved standards.  (*Id.* at PageID 4953–4955,

4963–4966.)

McGuffey complained that use of force was "out of control" since Rarrick took charge of

IA, and Rarrick complained that McGuffey misunderstood the proper standard for use of force

---

[1] Later in 2013, Rarrick received at least two weeks of additional IA training to become certified.  (Doc. 46 at PageID 4944.)

and failed to follow the protocol he created when injuries occurred at the Jail. (Doc. 46 at PageID 4971–4973.) Rarrick did not like McGuffey checking up on his investigations, and he told Schoonover and Neil so. (*Id.* at PageID 4992–4993.) According to McGuffey, Rarrick refused to inform her about the outcome of investigations for officers under her command, frustrating McGuffey. (Doc. 74 at PageID 9081–9082.)

Rarrick told Schoonover that McGuffey interfered with investigations and tampered with his witnesses. (Doc. 46 at PageID 4993.) For example, a female officer assisted a female work release inmate in making a complaint against a male officer who allegedly made inappropriate comments to the inmate. Rarrick investigated the female inmate (who acknowledged the comments but stated she was not offended by them) and concluded that the female officer should be disciplined for lying. McGuffey urged Schoonover not to discipline the female officer for fear that future officers would not come forward with these concerns. (*Id.* at PageID 4995–5008.) McGuffey told Schoonover and Rarrick, "[Y]ou cannot charge this female who brought these allegations forward because no other female will want to do it." (*Id.* at PageID 4996.) Rarrick responded, "I flat-out told her, you're getting your emotions way too involved in this." (*Id.*) Rarrick told Minnich, "this is going to turn into a tub of crap here pretty soon because [McGuffey] interfered." (*Id.*)

Neil and Schoonover told Rarrick that McGuffey denied interfering, and Rarrick insisted she was lying to them. (*Id.* at PageID 4986–4987.) Rarrick told Minnich not to have conversations with McGuffey or another officer about use-of-force investigations "because they didn't understand." (*Id.* at PageID 4988.) According to McGuffey, Rarrick commented in front of the Chief Deputy and the command staff that he had tried to lock the door to the command staff meeting room so that McGuffey would be unable to enter. (Doc. 74 at PageID 9060–9061.)

4

### C.  Supervisory Issues

Although swearing and stern voice tones are an accepted part of the HCSO culture, employees complained about McGuffey's use of profanity and harsh words.  (Doc. 46 at PageID 4975.)  However, Jim Knapp, Sheriff Neil's assistant and direct report, heard employees complain not just about McGuffey but also about Neil and Schoonover.  (Knapp Dep., Doc. 83 at PageID 11856.)  He "took it with a grain of salt" because "nobody ever likes the boss."  (*Id.*)  According to Knapp, Rarrick complained that McGuffey "would get mad at him for not, I guess, keeping her in the loop, if you will" regarding investigations.  (Doc. 83 at PageID 11859.)

In August 2016, Knapp called McGuffey and informed her he wanted to go to lunch on a specific day and time, and she agreed to go.  (Doc. 74 at PageID 9064.)  Knapp brought Rarrick to the lunch.  (*Id.*)  Knapp and Rarrick told McGuffey they "had a message for [her], and the message was that the men who work for [her] did not like [her] style of supervision."  (Doc. 74 at PageID 9065.)  Specifically, they told her, "you ask too many questions, you dive into procedure too much."  (*Id.*)  Then, according to McGuffey:

> I said, guys, I am actively changing policy, I'm working on this jail inspection and getting all of the standards met and so forth, and I absolutely have to understand what everyone is doing right down to the degree that I – you know, right down to the bottom line, so I can understand how to change it or what needs to be done.  And so I do ask questions and I am holding people accountable for their workloads.  And they said, one of them, well, the guys don't like it.  And I said, well, can you give me an example?  Because if you can give me an example, I'll change it.  And they both said, we can't give you an example.  Just know that if you don't stop doing what you're doing, we are going to tell [Schoonover] to fire you.  And I said, what? And they said, yeah, he fired Lorna[2] for the same thing because she wasn't getting along with people and we will tell him to fire you.

---

[2] Lorna Rose was an employee whose employment had been terminated from the HCSO.  (Doc. 83 at PageID 11873.)

5

(Doc. 74 at PageID 9065–9066 (footnote added for clarity).)  Knapp confirmed that this lunch

occurred and that they were "trying to help" McGuffey by suggesting she "let people under [her]

take care of certain things."  (Knapp Dep., Doc. 83 at PageID 11871–11872.)  Schoonover

confirmed that he allowed Knapp and Rarrick to take McGuffey to lunch to vet McGuffey's

subordinates' "minor complaints" about her.  (Schoonover Dep., Doc. 23 at PageID 1697–1698.)

Believing she was about to be fired after the lunch with Knapp and Rarrick, McGuffey

requested a meeting with Neil and Schoonover.  (Doc. 74 at PageID 9066–9067.)  She requested

a formal evaluation, and Neil said, "oh, you're doing great, you get a grade of A."  (*Id.* at PageID

9068.)  When she asked if there was anything she should change or anything he or Schoonover

would counsel her on, the Sheriff responded, "No, no, you're doing great."  (*Id.*)  In his

deposition, Neil confirmed that McGuffey asked for an evaluation, and he gave her an "A,"

adding that she was his "favorite major."  (Doc. 19 at PageID 221–222.)

### D.  Dobbins' Complaint

Dobbins began working for McGuffey in 2013.  Initially, Dobbins enjoyed serving as

McGuffey's administrative assistant.  She considered McGuffey a friend and a great boss.

(Dobbins Dep., Doc. 31 at PageID 2263–2266.)  Dobbins—and McGuffey—considered

McGuffey's office to be very fast-paced with many tasks to be done.[3]  (*Id.* at PageID 2266.)

By the end of 2016, Dobbins had become unhappy working for McGuffey, and she began

asking about a transfer.  (Doc. 31 at PageID 2167–2168.)  Major Price, supervisor of the Special

Services Division, offered to make Dobbins a recruiter in his division, and she agreed.  (*Id.* at

PageID 2173.)  She transferred in December 2016.

---

[3] Since McGuffey's termination, Jail Services and Court Services have been separated into two divisions overseen
by two separate officers.  (Doc. 31 at PageID 2265.)

In the HCSO, IA reports to Chief Deputy Schoonover.  If IA finds a complaint unfounded, Schoonover reviews it and, if he concurs, the process ends there.  (Doc. 19 at PageID 227.)  If the complaint is sustained and Schoonover concurs, the IA report proceeds to Neil for discipline.  (*Id.*)

On January 13, 2017, Dobbins filed a formal complaint against McGuffey, in which she complained that McGuffey would not let her return to the Jail after she transferred jobs, and she had to schedule an appointment to retrieve items she left in her former office.  According to Dobbins, "I believe this is an attempt to embarrass me and make me feel as if I have done something wrong due to the fact I am no longer working for her.  During the last 4 years Major McGuffey has 'bullied' me and made me do things that are not in my job description."  (Doc. 19-18 at PageID 691.)

During her interview with IA, Dobbins alleged that "there were some really good days in the office and [McGuffey] was easy to work with [but] . . . [t]here were times, depending on Major McGuffey's stress level, that the Major would be sharp and talk to her in a way that she described as 'awful.'"  (*Id.* at PageID 692.)  Dobbins complained that, beginning approximately six months into her nearly four years of working for McGuffey, McGuffey sometimes spoke to her in a way that made her feel "belittled and berated and made to feel like a child who was not performing her job properly."  (*Id.* at PageID 694.)  When asked about outside "triggers" that may have precipitated the change in working environment, Dobbins mentioned "a break-up" and "that Major McGuffey thought she was always under scrutiny from Chief Schoonover because she was a woman and thought she had to work harder to prove herself."  (*Id.* at PageID 695.)

In response to IA questioning, others indicated McGuffey "chewed [people] out" (*Id.* at PageID 697), "yelled and cussed" at them (*Id.* at PageID 698), "whooped [them] verbally" (*Id.* at

7

PageID 699), "is very pro-lesbian" (*Id.* at PageID 700), "scolds people" so they try to "avoid her totally" (*Id.*), treats personal friends more favorably than others (*Id.* at PageID 715–716), and "went way beyond to help females" (*Id.* at PageID 730).  Many of the incidents noted in the IA report happened in late 2013 or early 2014, during the transition from the prior administration to the Neil administration.

After receiving the IA report, Lawson and Schoonover recommended to Neil that McGuffey be terminated.  Schoonover was aware that McGuffey carried a heavy workload, but he did not consider disciplinary action for her short of termination.  (Doc. 23 at PageID 1700–1701.)

Sheriff Neil recognized that Major McGuffey had done "flat-out awesome" work bringing in outside agencies and incorporating new services into the county jail.  (Doc. 19 at PageID 158.)  He did not verify any claims in the IA report, but he reviewed the report and concluded:

> 31 deputies can't all be liars and not telling the truth.  And I had to make a decision.  Charmaine [McGuffey] and I have always had a very good relationship, but apparently the findings of this, that she doesn't always have a good heart with everybody, and I had to do what I had to do to protect the deputies of the Hamilton County Sheriff's Office and remove her from the position of Major but put her in a position where she can continue to work her magic and do wonderful things for the jail and for the people of Hamilton County.

(*Id.* at PageID 174.)  Sheriff Neil offered McGuffey a civilian position as Coordinator of Programming in the Jail and gave her thirty days to decide whether she would accept the demotion or be terminated.  She refused the demotion, and Neil terminated her employment.  After McGuffey's termination, the Sheriff promoted a heterosexual male to Major who assumed McGuffey's prior responsibilities.  (Turner Dep., Doc. 20 at PageID 928).

### E.  Procedural Posture

McGuffey alleges that Defendants terminated her employment: based on gender or sexual orientation, in violation of Title VII, 42 U.S.C. §2000e-2 and Ohio Revised Code Chapter 4112 (Counts I – IV); in retaliation for opposing unlawful employment practices, in violation of Title VII, 42 U.S.C. § 2000e-3 and Ohio Revised Code § 4112.02 (Counts V and VI); and in violation of public policy under Ohio law because she objected to IA's refusal to discipline officers in excessive use-of-force incidents (Count VII).  Defendants move for summary judgment on all claims.[4]

## II.     MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly

---

[4] In addition to moving for summary judgment on all claims, Defendants also moved to dismiss Plaintiff's claim for discrimination based on sexual orientation.  (Doc. 78 at PageID 11719.)  However, during the pendency of this motion, the Supreme Court of the United States resolved a split among the circuits on this issue, ruling that Title VII includes protection from discrimination based on sexual orientation.  *Bostock v. Clayton Cty., Georgia*, ___ U.S. ___, 140 S.Ct. 1731 (2020).  Accordingly, Defendants' motion to dismiss Plaintiff's claim for sexual orientation discrimination for failure to state a claim upon which relief can be granted is denied.

supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

Defendants moved for summary judgment on all claims. The Court will address each set of claims separately.

### A.  Gender and Sexual Orientation Discrimination Claims (Counts I—IV)

Plaintiff alleges Defendants violated Title VII and Ohio Revised Code Chapter 4112 by discriminating against her because she is female and a lesbian.[5] Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge, or otherwise discriminate against any

---

[5] "Chapter 4112 of the Ohio Revised Code prohibits, among other things, discrimination on the basis of sex. . . Because that statute's prohibitions mirror those of . . . Title VII, the state-law claims rise or fall on the resolution of the federal claims." *Hostettler v. College of Wooster*, 895 F.3d 844, 848, n.1 (6th Cir. 2018).

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The United States Supreme Court recently clarified that Title VII includes protection from discrimination based on sexual orientation or transgender status. *Bostock v. Clayton Cty., Georgia*, ___ U.S. ___, 140 S.Ct. 1731 (2020).

A plaintiff can rely on either direct or circumstantial evidence of discrimination to overcome a motion for summary judgment on a Title VII claim. *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948 (6th Cir. 2014). Where, as here, there is no direct evidence of unlawful discrimination, the Court must apply the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

> Under this approach, Plaintiff "must first make out a prima facie case of discrimination by showing: 1) that [she] was a member of a protected class; 2) that [she] was discharged; 3) that [she] was qualified for the position held; and 4) that [she] was replaced by someone outside of the protected class." *Griffin v. Finkbeiner,* 689 F.3d 584, 592 (6th Cir. 2012) (quotation marks omitted). Once a plaintiff has established her prima facie case, the burden "shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009).

*Shazor*, 744 F.3d at 957.

To establish pretext, a plaintiff must show that the stated reason has no basis in fact, did not actually motivate the decision, or was insufficient to warrant the adverse action. *Chen*, 580 F.3d at 400; *Miles v. South Central Human Resource Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 830 (6th Cir. 2019) (quoting *Montell v. Diversified Clinical Serv., Inc.*, 757 F.3d 497, 508 (6th Cir. 2014)).

11

In the case at bar, Defendants concede that McGuffey has established a *prima facie* case of discrimination based on sex.  (Doc. 78 at PageID 11707.)  Defendants offer as the legitimate nondiscriminatory reason for her termination the "findings in the IA investigation of creating a hostile work environment and dishonesty."  (Doc. 78 at PageID 11708.)  The issue before the Court, then, is whether McGuffey has offered evidence from which a jury could reasonably doubt that the HCSO fired her for the non-discriminatory reason stated.  The Court concludes that both the IA conclusions and the unusual nature of the IA investigation itself raise genuine issues of material fact from which jurors could reasonably doubt the employer's stated explanation.

### 1. Investigation Methods

McGuffey offers evidence that the way in which IA investigated the complaint against her differs significantly from IA investigations into similar complaints lodged against heterosexuals and men.  Plaintiff offered IA reports of others she alleges to be relevant, and Defendants identified seven other "hostile work environment" complaints IA investigated during the relevant period.  (Doc. 102 at PageID 12389.)  Viewing these investigations in the light most favorable to McGuffey, the dramatically different way in which IA conducted the McGuffey investigation creates a genuine issue of material fact regarding pretext.

#### a. *Vest Complaint Against Oberlander – 2015*

Corrections Officer ("C.O.") Aaron Vest lodged a formal complaint alleging that his supervisor, Sergeant Aaron Oberlander, swore at him, "talked down to him," and "belittled and embarrassed" him in front of others.  (Doc. 87-4 at PageID 11931.)  Vest felt "demoralized" and "humiliated," and it affected his job performance.  (*Id.* at PageID 11933.)  Vest specifically reported that Oberlander did this to him more than once and that he treated other officers

similarly. (*Id.* at PageID 11933.) Before even interviewing Sergeant Oberlander, IA "explained to Officer Vest that his allegations of 'hostile work environment' were not valid and did not rise to that level." (*Id.*) IA did not request names of nor interview any of the other officers whom Sergeant Oberlander allegedly "belittled and embarrassed." IA closed the complaint as unfounded.

### b. *Kilday Complaint Against Buchanan – 2015*

Sergeant Melissa Kilday lodged a formal complaint alleging that her supervisor, Lieutenant Brad Buchanan, "intimidated" and "bullied" her. (Doc. 23-7 at PageID 1852.) Specifically, Kilday alleged Buchanan became frustrated after Kilday was not transferred to make room in Buchanan's squad for Buchanan's personal friend. (Doc. 23-8 at PageID 1854.) After that, Kilday alleged, Buchanan repeatedly returned reports to her for correction without explanation and would often re-correct a report back to her original draft, requiring her repeatedly to stay past her normal shift without pay just to fix these reports. (*Id.*) IA interviewed Lieutenant Buchanan's supervisor, Captain Scheffler, as well as Kilday's former supervisor. According to the IA report, "Captain Scheffler believed that Lt. Buchanan was 60% harassing Sergeant Kilday and 40% of simply being a poor supervisor." (*Id.* at PageID 1855.) However, IA closed the complaint as unfounded. (*Id.* at PageID 1858.)

### c. *Durham Complaint Against McGuffey – 2016*

C.O. Jamelia Durham lodged a formal complaint against Plaintiff Charmaine McGuffey, alleging that McGuffey "completely went off on" her. (Doc. 99-1 at PageID 12110.) The IA report indicates that McGuffey received a report from a Cincinnati Police Department Detail Coordinator complaining about Durham for three specific reasons. (*Id.* at PageID 12111.) IA "explained to C.O. Durham that Major McGuffey and Captain Turner have a right to call her in

order to question her about a complaint . . . [and] informed that CPD does not want her to work anymore [sic] details for CPD." (*Id.*) IA closed the case as unfounded without further investigation. (*Id.*)

### d. Bonnell, Ebbers, and Reese Complaints Against Giblin and Noonan – 2016

Deputies Debbie Bonnell, Shana Ebbers, and Pam Reese lodged a formal complaint alleging that Director Karen Giblin and Supervisor Kenneth Noonan talked to subordinates about fellow co-workers and that Giblin "embarrasses [Bonnell] in front of other employees by yelling and cursing at her." (Doc. 99-1 at PageID 12108–12109.) The parties involved agreed to meet to resolve their concerns, and IA recommended the case be closed as unfounded because it did not rise to the level of a hostile work environment. (*Id.* at PageID 12109.)

### e. Kilday Complaint Against Reed – November 2018

Sergeant Melissa Kilday lodged a complaint involving "several incidents" in which Lieutenant Jacqueline Reed mistreated her and others. (Doc. 99-1 at PageID 12089.) Specifically, she alleged that Reed "berated" her, swore at her, spoke to her in a threatening tone, and attempted to "intimidate and ridicule me to show me she is the boss." (*Id.*) IA interviewed other witnesses who confirmed that the conversations at issue were "tense" and that Reed has such an "abrasive attitude" that one officer avoids her. (*Id.* at PageID 12090.) IA closed the investigation as "exonerated." (*Id.* at PageID 12091.)

### f. Magee Complaint Against Price – 2019

Sergeant John Magee lodged a formal complaint alleging that his supervisor, Major Earl Price, did not like him and intentionally limited his career advancement. (Doc. 99-1 at PageID 12087.) Apparently, without interviewing anyone other than Sergeant Magee, IA concluded that

his complaint did not constitute a hostile working environment, and recommended the case be closed as unfounded.  (*Id.* at PageID 12088.)

g. *Dobbins Complaint Against McGuffey – 2017*

On January 11, 2017, Heather Dobbins—after she transferred to another position—lodged an official complaint against McGuffey.  Specifically, she alleged that McGuffey "bullied" her, asked her to do things not in her job description, and caused her "undo [sic] stress" in her personal and professional life during the time she worked as McGuffey's administrative assistant.  (Doc. 19-18 at PageID 691.)  She believed that McGuffey limited the time she could return to her office to retrieve belongings after her transfer in "an attempt to embarrass me and make me feel as if I have done something wrong due to the fact I am no longer working for her." (*Id.*)

In investigating Dobbins' complaint, IA asked Dobbins for names of anyone who could elaborate on her complaint and ultimately interviewed more than thirty people.  (Dobbins Dep., Doc. 31 at PageID 2373–2400.)  However, according to McGuffey, IA failed to interview or discounted as untruthful the witnesses McGuffey identified.  (Doc. 74 at PageID 9185–9186.)  Indeed, Brian Hale told IA investigator Lee that he had been in "plenty of meetings" with McGuffey, "sometimes two or three times a day" and he did not recall ever attending a meeting where "she conducted herself in a bad way."  (Lee Dep., Doc 39 at PageID 3363.)  Instead of accepting Hale's testimony as true (as he had for witnesses adverse to McGuffey), Lee told him, "I have a lot of respect for you personally, professionally, everything, but you're ruining that right now."  (*Id.* at PageID 3364.)  Lee acknowledges that he questioned Hale's honesty for not remembering a four-year-old meeting, but he accepted as true another person's failure to recall

something that happened a week earlier. (*Id.* at PageID 3366.) IA sustained the hostile work environment complaint against McGuffey, leading to her termination.

Of the eight hostile work environment investigations Defendants identify, only one—Dobbins' complaint against McGuffey—was sustained. While the other investigations focused on the specific event alleged in the complaint (even where the complaint identified other relevant events and witnesses), the 2017 McGuffey investigation spanned her entire nearly four-year tenure as Major. In sharp contrast to the IA investigations of heterosexuals and males, IA sought out and questioned numerous people who never filed a complaint against McGuffey.[6] While the other IA investigation reports were less than five pages long, the one at issue here spans a massive 108 pages. The obvious differences in the way these investigations were conducted raise genuine issues of material fact as to pretext.

### 2. Investigation Findings

In addition to differences in the IA investigation methods, the IA conclusions offer insight into whether IA treated McGuffey differently than heterosexual or male employees who engaged in similar or more serious conduct. Specifically, where heterosexual male officers were involved, IA concluded that "hostile work environment" complaints are not actionable unless the complained behavior was based on protected status or constituted more than personal conflicts or petty slights, yet IA applied a different standard to the 2017 McGuffey investigation.

When Sergeant Melissa Kilday complained that Lieutenant Brad Buchanan, "intimidated" and "bullied" her, IA concluded—after consulting legal counsel—that "unless the

---

[6] For example, in April 2013 (when McGuffey was still new to her position), one inmate died in jail custody and another overdosed but was revived. (Doc. 19-18 at PageID 726.) Although the Lieutenant in charge "was very proud" of how his supervisors handled things, McGuffey telephoned him and began "firing questions at him" and made him feel "as though she was blaming him personally for inmate Barton's death and inmate Newman's OD." (*Id.*) In the course of the IA investigation of McGuffey four years later, IA investigators contacted the Lieutenant to interview him even though he had specifically chosen not to file a complaint against her. (*Id.* at PageID 726–727.)

actions were committed based upon her protective class then it did not rise to that level" of creating a hostile work environment.  (Doc. 23-7 at PageID 1852, 1856.)  IA found the hostile work environment complaint to be unfounded at least in part because Buchanan treated a male subordinate similarly.  (Doc. 102 at PageID 12385–12386.)  Schoonover concurred in that finding.  (Doc. 23-8 at PageID 1858.)

Similarly, when Sergeant John Magee brought a complaint against Major Earl Price alleging that Price "created a hostile work environment that has interfered with [Magee's] career," IA "informed Sgt. Magee that a hostile work environment complaint must prove a situation or situations where the employee is exposed to a work environment permeated with **discriminatory** intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions" of employment.  (Doc. 87-2 at PageID 11924 (emphasis added).)  On that basis, IA closed Magee's complaint as unfounded, and Schoonover concurred in that finding.  (*Id.* at PageID 11925.)

In sharp contrast, the complaint against McGuffey details alleged mistreatment of men and women equally.  (Doc. 19-18.)  No allegations or findings discuss discriminatory intent or actions based on hostility towards a protected class.  Yet, IA sustained the violation of Policy 215.00 – Hostile Work Environment against McGuffey.  (Doc. 19-18 at PageID 797–798.)

Furthermore, the IA investigation encompassed incidents dating back approximately four years to the very beginning of McGuffey's tenure as a Major.  (*Id.* at PageID 702–716, 719, 721–723, 725–729.)  Oddly, Jamelia Durham's allegations against McGuffey in 2016—that IA concluded to be "**UNFOUNDED**" on September 8, 2016 in IA Report #59-16—serve as one of the bases underlying the IA's 2017 report leading to McGuffey's termination.  (Compare Doc. 99-1 at PageID 12110–12111 with Doc. 19-18 at PageID 789–790, 796.)  Neither party

identified any other IA investigation in which a previously investigated, unfounded complaint later served as support for a subsequent finding that a violation occurred.

In the 2016 IA report by (then-Sergeant) Steve Minnich, Minnich concluded that it was Durham's own unsatisfactory performance that justified McGuffey's strong words and discipline against Durham.  (Doc. 99-1 at PageID 12111.)  In the 2016 IA investigation, "Captain Turner said that the interview was not confrontational and Major McGuffey did not cuss at C.O. Durham during this interview."  (*Id.*)  However, in the 2017 IA investigation underlying McGuffey's termination, (now-Lieutenant) Minnich describes the exact same incident as, "C.O. Durham became emotional as if she was reliving the incident" when "Major McGuffey yelled, screamed and leaned over her desk."  (Doc. 19-18 at PageID 789–790.)  In the 2016 investigation, Minnich supports the discipline McGuffey imposed against Durham, removing her from training.  (Doc. 99-1 at PageID 12111.)  Yet, in the 2017 IA report, Minnich states, "Captain Price said he did not want [Durham] out of training because she was doing fine and the Sheriff's Office had spent a lot of money to have her trained. Captain Price said it was not worth fighting the battle with Major McGuffey so he complied."  (Doc. 19-18 at PageID 790.)

What changed between Minnich's 2016 investigation of the Durham complaint and his massive 2017 investigation underlying McGuffey's termination?  Why was the same incident revisited but this time cast in a very different light?  Why did other hostile work environment investigations require discriminatory animus, but McGuffey's did not?  These questions present genuine issues of material fact relating to whether the stated reason for McGuffey's termination is pretextual.[7]  Accordingly, Defendants' Motion to Dismiss and for Summary Judgment must be denied as to McGuffey's gender and sexual orientation discrimination claims.

---

[7] Similarly, the 2017 IA report underlying McGuffey's termination contains a bullet point summary of words she used to officers substantiating the IA's "hostile work environment" finding.  (Doc. 19-18 at PageID 796–97.)  Of the

**B. Retaliation Claims (Counts V and VI)**

Federal and Ohio laws prohibit retaliating against employees who oppose unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a); Ohio Rev. Code § 4112.02; *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016).[8] To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity (i.e., communicated opposition to discriminatory employment practices); (2) defendants were aware of the protected activity; (3) after she engaged in protected activity, her employer took an employment action adverse to her; and (4) the protected activity caused the adverse action. *Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 826–27 (6th Cir. 2019); *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015). "The burden of establishing a prima facie case in a retaliation action is not onerous," and is "easily met." *Crawford*, 773 F. App'x at 827 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Once a plaintiff establishes a prima facie case, the burden shifts to defendants to provide evidence of a "legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006)). The plaintiff then must offer evidence from which a reasonable juror could conclude that the proffered reason is pretext for unlawful retaliation. *Id.*

Defendants contend that McGuffey cannot establish that she engaged in protected activity or that the protected activity caused the adverse employment action. (Doc. 78 at PageID 11720–

---

eight points listed, one of them ("You don't deserve to wear the badge") was also cited in the 2016 IA investigation dismissing Durham's complaint as unfounded. (Doc. 99-1 at PageID 1211.) A second quotes McGuffey as saying, "You should be charged with a crime" related to the Mize case. (Doc. 19-18 at PageID 796.) A grand jury has, in fact, indicted Jason Mize on a criminal charge related to that incident. *See United States v. Mize*, Case No. 1:18-cr-74 (S.D. Ohio).

[8] The same analysis governs retaliation claims pursuant to federal and Ohio statutes. *Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 827 n.2 (6th Cir. 2019). Thus, this Court will analyze McGuffey's state and federal retaliation claims together.

11722; Doc. 102 at PageID 12403–12405.)  The Court concludes that she has offered enough evidence to present these issues to a factfinder.

McGuffey complained to Neil and Schoonover that certain male subordinates treated her disrespectfully.  (Doc. 74 at PageID 9007–9019.)  According to McGuffey, Schoonover and Neil discouraged her from disciplining them, with Sheriff Neil indicating, "you just have to put up with it because they don't like working for a woman."  (*Id.* at PageID 9013.)  She alleges that her complaints "would be summarily dismissed."  (*Id.*)  Specifically, "that was typically how [Neil] would end the conversation, just know that they don't like working for a woman."  (*Id.*)

While this evidence is certainly not overwhelming, a juror can consider both the context of the alleged complaint and the response to it to infer that she was protesting discrimination. *See Crawford*, 773 F. App'x at 827.  "The governing principle from our caselaw is not that magic words must be intoned but that the language used be enough, in a specific factual context, to convey the accusation and its basis."  *Id.* at 829.  Because McGuffey testified that this conversation occurred more than once and because Neil allegedly responded based on gender,[9] a jury must determine whether the complaints constitute protected activity.  As to causation, the Court detailed above—in discussing pretext—the evidence that McGuffey was treated differently than others who did not exercise Title VII rights.  Accordingly, genuine issues of material fact preclude granting summary judgment in favor of Defendants, and their motion must be denied as to Plaintiff's retaliation claims.

### C.  Public Policy Claim (Count VII)

Ohio law recognizes a public policy exception to the general employment-at-will doctrine, commonly called a "*Greeley* claim."  *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598–

---

[9] Neil testified that he does not recall doing so and doubts that he would have responded in this way.  (Doc. 19 at PageID 155.)

599 (6th Cir. 2003) (referring to *Greeley v. Miami Valley Maint. Contractors, Inc.,* 49 Ohio St.3d

228, 551 N.E.2d 981 (1990), *overruled in part by Tulloh v. Goodyear Atomic Corp.,* 62 Ohio

St.3d 541, 584 N.E.2d 729 (1992)). To establish a *Greeley* claim for termination in violation of

public policy, a plaintiff must demonstrate:

> (1) "a clear public policy existed and was manifested in a state or
> federal constitution, statute or administrative regulation, or in the
> common law (the clarity element)"; (2) dismissal "under
> circumstances like those involved in the plaintiff's dismissal would
> jeopardize the public policy (the jeopardy element)"; (3) "the
> plaintiff's dismissal was motivated by conduct related to the public
> policy (the causation element)"; and (4) lack of an "overriding
> legitimate business justification for the dismissal (the overriding
> justification element)." *Collins v. Rizkana*, 73 Ohio St.3d 65, 69–70,
> 652 N.E.2d 653 (1995) (emphases omitted). The first and second
> elements are questions of law for the court to decide, but the jury
> decides questions of fact relating to the latter two elements. *Id.* at
> 70, 652 N.E.2d 653.

*Hale v. Mercy Health Partners*, 617 F. App'x 395, 402 (6th Cir. 2015).

In the case at bar, Defendants contend that McGuffey cannot establish the jeopardy

element required to survive summary judgment. (Doc. 78 at PageID 11723; Doc. 102 at PageID

12406.) In the Sixth Circuit, courts apply a three-factor analysis to evaluate the jeopardy

element:

> (1) [D]etermine "what kind of conduct is necessary to further the
> public policy" at issue; (2) decide whether the employee's actual
> conduct fell within the scope of conduct protected by this policy;
> and (3) consider whether employees would be discouraged from
> engaging in similar future conduct by the threat of dismissal.
> *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003)
> (citation omitted). A plaintiff need not "be certain that the seemingly
> inappropriate conduct is actually illegal" for his actions to fall within
> the scope of conduct protected by this policy. *Id.* at 600. "Rather, an
> employee simply must have had a 'good faith belief that [his]
> complaint was valid' at the time of his complaint." *Id.* (alteration in
> original) (quoting *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d
> 134, 677 N.E.2d 308, 324 (1997)).

21

*Bender v. Champlain Enterprises, LLC*, 797 F. App'x 1008, 1014 (6th Cir. 2020).

      McGuffey complained that "use-of-force is out of control," and she "felt like people were guilty of excessive force more than" IA investigators did. (Doc. 46 at PageID 4972.) McGuffey took those complaints to Neil and Schoonover—the supervisors who ultimately terminated her employment. (Doc. 19 at PageID 142–147; Schoonover Dep., Doc. 23 at PageID 1521–1523.) Conversely, Rarrick complained to Schoonover and Neil "several" times that McGuffey did not understand proper use of force guidelines and should not involve herself in IA's excessive force investigations. (Doc. 46 at PageID 4937; Doc. 23 at PageID 1521–1522, 1528.) According to Neil, McGuffey's disagreement with IA's use-of-force conclusions "cost the county $90,000 in a lawsuit filed against us on a use-of-force matter because [McGuffey] didn't follow the Graham Factors."[10] (Doc. 19 at PageID 136, 139–40.) According to Neil, "her heart was there, absolutely," but "she got out of her lane." (*Id.* at PageID 137, 139.)

      The parties agree that the Constitutions of the United States and Ohio establish a public policy prohibiting excessive use of force by law enforcement personnel. Applying the three-factor analysis, McGuffey's complaints that IA permitted HCSO employees to use excessive force without punishment fell within the scope of conduct necessary to further the public policy prohibiting excessive force. In addition, if a high-ranking fiduciary employee could be terminated for calling out alleged excessive force, the threat of termination would discourage other employees from similarly opposing excessive use of force within the Jail. Thus, viewing all evidence in McGuffey's favor—as the Court must in evaluating a motion for summary judgment—genuine issues of fact preclude a finding that she has failed to establish the jeopardy element.

---

[10] "Graham factors" refers to a United States Supreme Court case evaluating constitutionally excessive force, *Graham v. Connor*, 490 U.S. 386 (1989).

Defendants contend that McGuffey did not understand the law relating to unconstitutional use of force and that her complaints that IA allowed excessive use of force to go unpunished are simply mistaken.  Defendants may well be correct.  However, the conduct about which McGuffey complained need not actually be illegal to serve as the basis for a *Greeley* claim if McGuffey had a good faith belief that her complaint was valid when she made it.  *See Bender*, 797 F. App'x at 1014.  Even Defendants do not allege that McGuffey's complaints were not made in good faith.

Defendants next contend that McGuffey failed to provide "clear notice" to Neil or Schoonover that she was acting to protect public policy.  "In addition to making a good-faith complaint, . . .  an employee must also 'give the employer clear notice that the employee's complaint is connected to a governmental policy. . . [such that] a reasonable employer would understand that the employee relies on the policy as the basis for his complaint.'"  *Bender*, 797 F. App'x at 1014 (quoting *Jermer v. Siemens Energy & Automation, Inc*., 395 F.3d 655, 656 (6th Cir. 2005)).

As explained above, Neil referenced McGuffey's alleged misunderstanding of the "*Graham* factors" in discussing her complaints about excessive force and IA's investigations into specific use-of-force incidents.  The *Graham* factors are those used to evaluate whether force rises to an unconstitutional level.  *Graham v. Connor*, 490 U.S. 386 (1989).  Therefore, the fact that Neil and others reference those factors in discussing McGuffey's complaints about excessive force create genuine issues of material fact concerning whether McGuffey provided clear notice that she was acting to protect the public policy prohibiting excessive use of force.

23

IV.     CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss and for Summary Judgment (Doc. 78) is **DENIED**.  The Court will conduct a Final Pretrial Conference in this matter on **November 9, 2020 at 10:00 a.m.** with trial to commence on **December 7, 2020 at 9:30 a.m.**

**IT IS SO ORDERED**.

Dated:  July 29, 2020              S/Susan J. Dlott_____
                                  Judge Susan J. Dlott
                                  United States District Court